Nelson v. Alliance Hospitality Mgmt., LLC, 2013 NCBC 43.

| | |
|---|---|
| STATE OF NORTH CAROLINA | IN THE GENERAL COURT OF JUSTICE |
| | SUPERIOR COURT DIVISION |
| COUNTY OF WAKE | 11 CVS 3217 |

KENNETH E. NELSON,       )
                                   )
             Plaintiff,        )
                                     )
        v.                   )
                                       )
ALLIANCE HOSPITALITY         )           **ORDER AND OPINION**
MANAGEMENT, LLC, a Georgia    )
limited liability company, ROLF A.    )
TWEETEN, and AXIS HOSPITALITY, )
INC., an Illinois corporation,      )
                                       )
            Defendants.     )
                                       )

{1} THIS MATTER is before the court on cross-motions for summary judgment pursuant to Rule 56 of the North Carolina Rules of Civil Procedure ("Rule(s)"). For the reasons stated below, Plaintiff's motion is DENIED and Defendants' motion is GRANTED.

> *Meynardie & Nanney, PLLC by Joseph H. Nanney for Plaintiff Kenneth E. Nelson.*
>
> *Smith, Anderson, Blount, Dorsett, Mitchell & Jernigan, LLP by Michael W. Mitchell and Jackson Wyatt Moore, Jr. and Leader, Bulso & Nolan, PLC by Eugene N. Bulso, Jr. for Defendants.*

Gale, Judge.

## I. INTRODUCTION

{2} Plaintiff Kenneth E. Nelson's ("Nelson") Motion calls upon the court to dismiss the counterclaims of Axis Hospitality, Inc. ("Axis") for declaratory judgment and reformation; declare that Nelson holds ten of Alliance Hospitality Management, LLC's ("Alliance") sixty-one Membership Interest Units outstanding; declare Axis in

breach of Alliance's Operating Agreement; declare Axis and Rolf A. Tweeten ("Tweeten") in breach of the duty of good faith; and find Axis and Tweeten liable for breach of fiduciary duty.

{3}     Axis, Alliance, and Tweeten's (collectively "Defendants") Motion calls upon the court to dismiss each of the seven categories of damages sought by Nelson: (1) damages incurred from the sheriff's sale of 4107 W. Gazebo Hill Boulevard, Mequon, Wisconsin ("Gazebo Hill Property"); (2) damages incurred from the sheriff's sale of 10065 River Road N. ("River Road Property"); (3) Orlando Residence, Ltd.'s ("ORL") purchase of a South Carolina Confession of Judgment executed by Nelson; (4) attorney's fees incurred in connection with the sheriff's sales; (5) moving expenses incurred in vacating the Gazebo Hill Property; (6) the loss of value in Nelson's interest in Alliance; and (7) punitive damages.

## II.     PROCEDURAL HISTORY

{4}     Nelson initiated this lawsuit on February 25, 2011, and filed an Amended Complaint on June 1, 2011, bringing claims for: (1) breach of fiduciary duty; (2) constructive fraud; (3) judicial dissolution of Alliance; (4) a declaratory judgment that Nelson owns ten of Alliance's sixty-one outstanding Membership Interest Units; and (5) wrongful termination.  The matter was designated a Complex Business Case by Order of Chief Justice Sarah Parker dated March 22, 2011, and assigned to the undersigned on March 24, 2011.

{5}     On February 28, 2011, Defendants filed their answer and counterclaim, filed an amended counterclaim on April 11, 2011, and filed a second amended counterclaim on July 11, 2011.  In their second amended counterclaim, Defendants brought counterclaims for a declaratory judgment, or in the alternative, reformation of the document titled as Admission of New Member, seeking to limit Nelson's ownership interest in Alliance to a fixed 10%.  (2nd Am. Countercl. ¶¶ 47–58.)  Defendants also brought counterclaims for negligent misrepresentation,

constructive fraud, and breach of fiduciary duties by Nelson. (2nd Am. Countercl. ¶¶ 59–76.)

{6} On July 29, 2011, Nelson filed a Motion to Dismiss Counts III and IV of Defendants' Second Amended Counterclaim ("Plaintiff's Motion to Dismiss") and Defendants filed a Motion to Dismiss Plaintiff's First, Second, Fourth, and Fifth Claims ("Defendants' Motion to Dismiss"). On November 22, 2011, the court denied Plaintiff's Motion to Dismiss, granted Defendants' Motion to Dismiss as to Nelson's wrongful termination claim, and denied Defendants' Motion as to Nelson's other claims.

{7} Axis dismissed its counterclaims on February 15, 2012. Tweeten and Alliance dismissed the remaining counterclaims on August 28, 2012.

{8} On September 13, 2012, Tweeten and Alliance filed a Motion for Summary Judgment ("Defendants' Motion for Summary Judgment As to Status and Interest"). On January 3, 2013, the court denied Defendants' Motion, holding that Nelson had become a Member in Alliance, but that the issues of whether Nelson is insolvent, and if insolvent, whether he has lost his status of Member due to insolvency, and the extent of Nelson's ownership interest in Alliance, depended upon the resolution of disputed material facts.

{9} Defendants filed their present Motion on March 20, 2013. Plaintiff filed his present Motion on April 3, 2013. The Motions have been fully briefed, the court heard oral argument on June 18, 2013, and the matter is ripe for disposition.

### III.   STATEMENT OF FACTS

{10} The court does not make findings of fact when ruling upon a motion for summary judgment. *See Hyde Ins. Agency, Inc. v. Dixie Leasing Corp.*, 26 N.C. App. 138, 142, 215 S.E.2d 162, 164–65 (1975). The court believes the following facts are either uncontested or, if contested, have been construed in favor of the party who opposes the Motion.

{11}    The court here will only discuss those facts relevant to the present Motions.  A more complete factual background can be found in this court's January 3, 2013 Order.

A.    The Gazebo Hill and River Road Properties

{12}    On November 28, 1990, Nelson and his wife, Susan Nelson ("Mrs. Nelson"), executed a Postnuptial Agreement.  (Mem. of Law in Supp. of Defs.' Mot. for Summ. J. as to Damages 7; Bulso Aff. Ex. 5, Mar. 15, 2013.)  In that Postnuptial Agreement, Nelson and his wife agreed that all property, "whether presently in existence and owned by Mrs. Nelson or hereafter acquired in any manner by her" would remain Mrs. Nelson's separate property and that Nelson would not claim any right to or interest in Mrs. Nelson's separate property.  (Bulso Aff. Ex. 5, at 2, 4–5.)

{13}    Mrs. Nelson purchased the Gazebo Hill Property sometime around June 1, 1990 (Bulso Aff. Ex. 6, Mar. 15, 2013), and purchased the River Road Property sometime around June 16, 1997.  (Bulso Aff. Ex. 4, Mar. 15, 2013.)  Nelson was not listed on the deeds or tax bills for either property, and has testified that he owns no interest in either property.  (Nelson Dep. 45:18–49:7, June 21, 1996; Nelson Dep. 4:7–16, 8:16–19, 12:13–13:12; Bulso Aff. Exs. 2, 3, 7, Mar. 15, 2013; Mem. of Law in Supp. of Defs.' Mot. for Summ. J. as to Damages 7.)

{14}    On November 18, 2008, Judge McCormack issued an order in a case pending in Ozaukee County, Wisconsin regarding the availability of the Gazebo Hill and River Run properties to satisfy a debt Nelson owed to ORL.[1]  (Bulso Aff. Ex. 15, Mar. 20, 2013.)  The order recognized the Nelsons' 1990 Postnuptial Agreement, but found that ORL did not have "notice of this Post-Nuptial Agreement before the obligation to ORL was incurred; therefore, [under Wisconsin law] the agreement can have no effect upon the marital property available to satisfy ORL's Judgment." (Bulso Aff. Ex. 15, at 3–4, Mar. 20, 2013.)

---

[1] For a detailed account of the long history of debt-related litigation between ORL and Nelson, *see Orlando Residence, Ltd. v. GP Credit Co., LLC*, 553 F.3d 550 (7th Cir. 2009); *Orlando Residence, Ltd. v. Hilton Head Investors*, 2013 U.S. Dist. LEXIS 360875 (D. S.C. Mar. 15, 2013).

{15}   On September 9, 2010, both properties were sold at sheriff's sales. (Mem. of Law in Supp. of Defs.' Mot. for Summ. J. as to Damages 5; Nelson's Resp. to Defs.' Mot. for Partial Summ. J. 7.)

{16}   On June 6, 2011, Judge Muehlbauer issued an order in the Circuit Court of Ozaukee County, Wisconsin denying the Nelsons' Motion to Set Aside the September 9th, 2010 sheriff's sales, in which Judge Muehlbauer determined that the prices obtained at the sheriff's sales were fair. (Bulso Aff. Ex. 13, at 4–6, Mar. 20, 2013.) The time for Nelson to redeem the two properties expired on September 9, 2011. (Nelson's Resp. to Defs.' Mot. for Partial Summ. J. 8.)

B.     The South Carolina Judgment

{17}   On July 11, 1994, Nelson executed a Confession of Judgment in favor of the Resolution Trust Corporation in the amount of $4 million in the U.S. District Court for the District of South Carolina (the "South Carolina Judgment"). (Bulso Aff. Ex. 16, Mar. 20, 2013.) On February 23, 1995, Asset Recovery & Management Services, L.P. become the successor-in-interest to all rights of Resolution Trust Corporation, including the South Carolina Judgment. (Bulso Aff. Ex. 10, Mar. 20, 2013.) Asset Recovery & Management Services, L.P. then assigned the South Carolina Judgment to GP Credit Company for $20,000.00 on November 30th, 1995. (Bulso Aff. Exs. 10, 11, Mar. 20, 2013.) Mrs. Nelson signed the purchase agreement on behalf of GP Credit Company. (Bulso Aff. Ex. 11, Mar. 20, 2013.)

{18}   On June 7, 2011, in response to ORL's Motion to Apply Property to Judgment, Judge Muehlbauer issued an order in the Circuit Court of Ozaukee County, Wisconsin, finding that the South Carolina Judgment divested from GP Credit Company and vested in ORL, and awarding a $20,000.00 credit against ORL's judgment against Nelson.[2] (Bulso Aff. Ex. 14, Mar. 20, 2013; Nelson's Mem. in Supp. of his Mot. for Partial Summ. J. 15.) ORL then filed the Confession of

---

[2] It has previously been judicially determined that GP Credit Co., LLC is the alter ego of Nelson. *See Orlando Residence, Ltd. v. GP Credit Co., LLC*, 609 F. Supp. 2d 813, 817 (E.D. Wis. 2009), *rev'd on other grounds by* 553 F.3d 550, 555 (7th Cir. 2009).

Judgment in the U.S. District Court for the District of South Carolina, and the South Carolina court then, on August 15, 2012, issued a judgment in favor of ORL against Nelson in the amount of $4 million. (Bulso Aff. Ex. 1, Sept. 13, 2012; Nelson's Mem. in Supp. of his Mot. for Partial Summ. J. 16.) ORL filed the South Carolina judgment in the North Carolina Superior Court of Wake County on September 11, 2012 (Nelson's Mem. in Supp. of his Mot. for Partial Summ. J. 16; Carrie Tweeten Aff. Ex. 2, at ¶ 5, Mar. 19, 2013), and Judge O'Foghludha granted ORL's Motion to enforce that judgment on February 13, 2013. (Carrie Tweeten Aff. Ex. 3, at ¶¶ 1, 3–4, Mar. 19, 2013.)

C.    The Tennessee Judgment

{19}    ORL obtained a judgment in the amount of $797,615.00 against Nelson in the Chancery Court for Davidson County, Tennessee, on October 7, 2004 (the "Tennessee Judgment"). (Carrie Tweeten Aff. Ex. 1, at ¶ 1, Mar. 19, 2013.) The Chancery Court for Davidson County, Tennessee ordered on April 12, 2011 that interest on the Tennessee Judgment would accrue 10% per year, compounded annually. (Carrie Tweeten Aff. Ex. 1, at ¶ 2, Mar. 19, 2013.) The Superior Court of North Carolina issued an order on May 12, 2011, finding that the total outstanding balance of the Tennessee Judgment as of April 25, 2011 was $121,127.85, with $32.17 in interest accruing per diem. (Carrie Tweeten Aff. Ex. 1, at ¶ 2, Mar. 19, 2013.)

D.    Distribution of Sale Proceeds

{20}    The sale of a substantial portion of Alliance's assets to Interstate Hotels & Resorts, Inc. ("Interstate") closed on April 1, 2011 ("Interstate Transaction") for $8,500,000.00 ("Sale Proceeds"). (Am. Compl. ¶ 47.) On May 11, 2011, counsel for Nelson wrote Alliance to request a distribution of the Sale Proceeds pursuant to § 7.3 of the Operating Agreement, and noted that no tax distribution had been made to Nelson. (Am. Compl. ¶ 61; Moore Aff. Ex. 1, May 6,

2013; Operating Agreement § 7.3.) Nelson's counsel also wrote that he was "aware of the charging order that Orlando Residence requested, and underst[ood] that the distribution of Mr. Nelson's share may have to be made to the court pending further orders." (Moore Aff. Ex. 1, May 6, 2013.) This request was received by Alliance on May 12, 2011. (Moore Aff. Ex. 1, May 6, 2013.) On that same day, Judge O'Foghludha issued a Charging Order in the case pending by ORL against Nelson (Case No. 11-CVS-002150) ("Charging Order No. 1") regarding the Tennessee Judgment. (Carrie Tweeten Aff. Ex. 1, Mar. 19, 2013.) Charging Order No. 1 provides that:

> 2. . . . any distributions, allocations, or payments in any form otherwise due from Alliance Hospitality Management, LLC, to Kenneth E. Nelson up to $121,127.85 shall not be paid to Nelson but shall instead be paid to Orlando Residence, Ltd. . . . .

> 3. As the interest is accruing at $32.17 daily, and as the parties represented to the Court during the hearing of this matter that the outstanding balance of the Judgment may fluctuate depending on Court rulings in other states, any distributions, allocations, or payments in any form otherwise due from Alliance Hospitality Management, LLC, to Kenneth E. Nelson over and above the amount set forth in the preceding paragraph shall not be paid to Nelson but shall instead be paid to the Wake County Clerk of Superior Court and deposited in the registry of the Court to abide the further orders of this Court.

(Carrie Tweeten Aff. Ex. 1, at 4, Mar. 19, 2013.)

{21} Counsel for Defendants responded on May 27, 2011 that, in fact, a tax distribution in the amount of $15,754.00 had been delivered to Nelson on April 16, 2011, but that Nelson had refused delivery. (Moore Aff. Ex. 2, May 6, 2013.) Nelson denies that he received the distribution. (Nelson's Resp. to Defs.' Mot. for Partial Summ. J. 8; Nelson's Mem. in Supp. of his Mot. for Partial Summ. J. 15.) Counsel for Defendants also responded that "Alliance's managers do not anticipate making a further distribution at the present time. Alliance intends to continue its existing operations and to expand them." (Moore Aff. Ex. 2, May 6, 2013.) Lastly, Defendants' counsel explained that the Interstate Transaction involved structured

payments, that Alliance had not at that time, and may not ever, receive the total amount of the Sale Proceeds, and that Alliance had certain other liabilities outstanding. (Moore Aff. Ex. 2, May 6, 2013.)

{22} Thereafter, Alliance distributed funds several times, each time in accordance with Charging Order No. 1: $15,754.00 was paid to ORL on July 18, 2011; $105,373.85 was paid to ORL and $126,021.35 was paid into the Wake County Superior Court on March 14, 2012; $85,727.20 was paid into Wake County Superior Court on October 19, 2012; $104,465.27 was paid into Wake County Superior Court on January 22, 2013; and $179,366.95 was paid into Wake County Superior Court on February 6, 2013. (Carrie Tweeten Aff., March 19, 2013; Resp. to Kenneth E. Nelson's Mot. for Summ. J. 5–6.)

{23} On February 14, 2013, Judge O'Foghludha entered a second Charging Order in the same Tennessee Judgment case (Case No. 11-CVS-002150) ("Charging Order No. 2"). Charging Order No. 2 found that Alliance had paid the $121,127.85 Nelson owed to ORL for the Tennessee Judgment. (Carrie Tweeten Aff. Ex. 2, March 19, 2013; Nelson's Mem. in Supp. of his Mot. for Partial Summ. J. 16.) Charging Order No. 2 also ordered the Clerk of Superior Court to release the October 19, 2012, January 22, 2013, and February 6, 2013 distributions, totaling $369,559.42, to ORL to be applied to the South Carolina Judgment, and ordered that any additional distributions to Nelson up to the amount of $4 million plus post-judgment interest be paid to ORL. (Carrie Tweeten Aff. Ex. 2, March 19, 2013; Resp. to Kenneth E. Nelson's Mot. for Summ. J. 6.) That same day Judge O'Foghludha entered a Charging Order in a separate case pending by ORL against Nelson (Case No. 12-CVS-12861) ("Charging Order No. 3") regarding the South Carolina Judgment, which ordered that any distributions from Alliance up to the amount of $4 million plus post-judgment interest be paid to ORL. (Carrie Tweeten Aff. Ex. 3, March 19, 2013; Resp. to Kenneth E. Nelson's Mot. for Summ. J. 6.)

{24} On March 7, 2013, $100,000.00 was paid to ORL in compliance with Charging Order No. 3. (Carrie Tweeten Aff., March 19, 2013; Resp. to Kenneth E. Nelson's Mot. for Summ. J. 6.) A total of $716,708.62 (which Carrie Tweeten, a

Director and officer of Alliance, testifies to be 10% of the total distributions Alliance has made during the same time period) has therefore been distributed as a payment in satisfaction of judgments against Nelson and in accordance with the three Charging Orders.  (Carrie Tweeten Aff., March 19, 2013.)

## IV.    LEGAL STANDARD

{25}    Summary judgment is proper when the pleadings, depositions, answers to interrogatories, admissions, and affidavits show that no genuine issue as to any material fact exists and that the movant is entitled to judgment as a matter of law.  N.C. GEN. STAT. § 1A-1, Rule 56(c); *Andresen v. Progress Energy, Inc.*, 204 N.C. App. 182, 184, 696 S.E.2d 159, 160–61 (2010).

## V.    ANALYSIS

A.    Plaintiff's Motion for Summary Judgment

1.    There are no remaining counterclaims to dismiss against Nelson.

{26}    Plaintiff seeks the court's dismissal of Defendants' counterclaims against Nelson.  Axis dismissed its counterclaims on February 15, 2012, and Tweeten and Alliance dismissed the remaining counterclaims on August 28, 2012. As such, there are no remaining counterclaims to be dismissed, and Nelson's Motion is MOOT in that respect.

2.    The court has already ruled that the determination of whether Nelson holds ten of Alliance's sixty-one outstanding Membership Units depends upon the resolution of contested issues of material fact.

{27}    Plaintiff contends that the court may revisit the issue of Nelson's ownership interest in Alliance, and seeks the court's declaration that Nelson owns ten of Alliance's sixty-one Membership Units outstanding.  (Nelson's Mem. in Supp. of his Mot. for Partial Summ. J. 32.)  In it's January 3, 2013 Order and Opinion, the court concluded that there are disputed issues of material fact which preclude

determining the extent of Nelson's membership interest.  (Order and Opinion ¶¶ 44–52, Jan. 3, 2013.)  While the court agrees with Nelson that "[m]ultiple documents can constitute a single agreement" (Nelson's Mem. in Supp. of his Mot. for Partial Summ. J. 33), the court has already determined that a jury must resolve the question of whether the Consent Resolution and Admission of New Member documents should be construed to have effectively transferred ten Membership Interest Units to Nelson.  (Order and Opinion ¶¶ 48, 52, Jan. 3, 2013.)

{28}    The court is also not persuaded by Nelson's contention that, "[a]n admission that Nelson holds an interest, any interest, in Alliance is an admission that there was a valid Board action granting an interest in Alliance to Nelson." (Nelson's Mem. in Supp. of his Mot. for Partial Summ. J. 35.)  In its January 3, 2013 Order, the court held that Nelson owned a 10% ownership interest in Alliance by virtue of an oral promise from Tweeten and Alliance's recognition of that promise, "even if valid Board action has not been taken."  (Order and Opinion ¶ 43, Jan. 3, 2013.)  An admission by Alliance of this 10% ownership does not necessarily equate to an admission that valid Board action was taken to further transfer Membership Interest Units to Nelson.

{29}    As the court has already made the determination that the issue of Nelson's interest cannot be resolved on summary judgment, the court DENIES Plaintiff's Motion for Entry of Partial Summary Judgment to the extent that it seeks a ruling that Nelson holds ten of Alliance's sixty-one Membership Units outstanding.


3.    <u>The court has already ruled on Plaintiff's single breach of contract/breach of the duty of good faith and fair dealing claim.</u>

{30}    Plaintiff also seeks a summary adjudication that Axis is in breach of Alliance's Operating Agreement.

{31}    In his Amended Complaint, Nelson brought a claim for breach of contract/wrongful termination, which alleged that Alliance breached the implied duty of good faith and fair dealing by removing him from the Board of Directors and

terminating his employment as Chief Financial Officer. (Am. Compl. ¶¶ 102–09.) That claim was dismissed in the court's November 22, 2011 Order. (Order on Mot. to Dismiss 16, Nov. 22, 2011.) Plaintiff now calls upon the court to declare Axis and Tweeten in breach of the Operating Agreement for failing to distribute the Sale Proceeds. (Nelson's Mem. in Supp. of his Mot. for Partial Summ. J. 18.)

{32} Alliance's Operating Agreement grants full discretion to the Directors[3] regarding the distribution of sales proceeds to Members. (Operating Agreement § 7.3.) As far as the court can decipher[4], at the times relevant to this Motion, the Directors of Alliance's Board were: Tweeten, Tweeten's wife, Carrie Tweeten, and Tweeten's son, Kent Tweeten.[5] Axis, while a Member of Alliance, is not a Director, and cannot control the distribution of the Sale Proceeds. (Nelson's Mem. in Supp. of his Mot. for Partial Summ. J. 25 ("By its terms, the exculpation provision covers only Directors. Thus, Axis is not covered.").) Nelson's Motion seeking to hold Axis in breach of the Operating Agreement for failing to distribute the Sale Proceeds is therefore DENIED.

{33} The court further DENIES Nelson's Motion to the extent that it seeks the court's declaration that Tweeten is in breach of Alliance's Operating Agreement for failing to distribute the Sale Proceeds because Plaintiff never stated this claim in the pleadings.

---

[3] Section 7.3 of the Operating Agreement vests the discretion to distribute sales proceeds in the "Manager." The Operating Agreement then defines the Manager as the Board of Directors, and that "[o]nly an act or determination of a majority of the Directors is an act or determination of the Manager." (Operating Agreement § 2.1.)

[4] As of the date the Operating Agreement was adopted in February, 2008, Alliance's Board of Directors consisted of Nelson, Tweeten, and Hansen. (Order and Opinion ¶ 18.) In its January 3, 2013 Order, the court determined that Hansen resigned as a Director of Alliance on June 27, 2008, and was replaced by Carrie Tweeten, the wife of Defendant Tweeten, on November 1, 2010. (Order and Opinion ¶ 46; Tweeten Aff. Ex. 2, Sept. 12, 2012.) Nelson was removed as a Director on January 17, 2011. (Am. Compl. ¶ 43.) Tweeten's son, Kent Tweeten, became a Director on the Board of Alliance on that same day. (Tweeten Aff. Ex. 3, Sept. 12, 2012.)

[5] Carrie and Kent Tweeten are not Parties to this lawsuit.

4. <u>The court has already determined that contested issues of material fact prevent a summary finding that Axis and Tweeten are liable for breach of fiduciary duty.</u>

{34} Plaintiff's Motion lastly calls upon the court to find that Axis and Tweeten owe fiduciary duties to Nelson regardless of whether Nelson remains a Member or has acquired the status of transferee due to his insolvency, and further that Axis and Tweeten have breached these fiduciary duties.

{35} Nelson alleges that Tweeten owes Nelson fiduciary duties by virtue of Tweeten's status as a Manager of Alliance, and that Axis owes fiduciary duties because it has the right to appoint Directors. (Nelson's Mem. in Supp. of his Mot. for Partial Summ. J. 23–24 (citing *Denim N. Am. Holdings, LLC v. Swift Textiles, LLC*, 816 F. Supp. 2d 1308 (M.D. Ga. 2011)).) The court agrees that Tweeten, as a Director of Alliance, owes a fiduciary duty to Nelson pursuant to Ga. Code Ann. § 14-11-305(1) (2013). *See Internal Med. Alliance, LLC v. Budell*, 290 Ga. App. 231, 236, 659 S.E.2d 668, 673 ("Managing members of a LLC owe fiduciary duties to the LLC and its member investors." (citing Ga. Code Ann. § 14-11-305(1))). However, the court believes there is a genuine issue of material fact as to whether Axis owes fiduciary duties to Alliance's Members.

{36} The Middle District of Georgia applied Georgia law to the question of whether a member of a manager-managed LLC owed fiduciary duties to another member of the LLC by reason of its power to appoint and remove managers. *Denim N. Am. Holdings*, 816 F. Supp. 2d at 1325–26. The court noted that under Georgia law, typically a member does not owe duties to other members "solely by reason of acting in his or her capacity as a member." *Id.* at 1325 (quoting Ga. Code Ann. § 14-11-305(1) (2013)). However, the member in question was given the power, via the LLC's Operating Agreement, to appoint four of the LLC's eight managers, and the Operating Agreement provided that a majority of the managers must approve any action before a manager may act. *Id.* The court concluded that the member's "ability to appoint four managers gave it *de facto* control of the [LLC's] board of managers. That control creates a genuine fact dispute as to whether [the member]

was a managing member of [the LLC] and therefore owed fiduciary duties to [the other member]." *Id.* at 1325–26.

{37}  Similarly, Alliance's Operating Agreement gives Axis the authority to designate two of Alliance's three Directors and to remove those Directors at any time with or without cause, and states that only an act approved by the majority of Alliance's Directors is an act by the Manager. (Operating Agreement §§ 2.1, 3.3, 3.6.) Beyond the powers given the member in *Denim*, Alliance's Operating Agreement further provides that the appointment of the third Director is subject to the reasonable approval of Axis. (Operating Agreement § 3.3.) The court concludes that this ability to appoint and remove Directors creates an issue of fact as to whether Axis owed fiduciary duties to the other Members of Alliance, including Nelson so long as he retains his status as a Member.

{38}  A separate question is whether Tweeten, and Axis if it owes any fiduciary duty, owe fiduciary duties not only to Members but also to transferees. This question is determined pursuant to Georgia law. If Nelson is insolvent as that term is used in the Operating Agreement, then he is deemed to have only the rights, powers, and privileges of a transferee. (Operating Agreement § 4.6.) Section 8.4 of Alliance's Operating Agreement provides that a transferee:

> shall not be entitled to any of the rights, powers, or privileges of its predecessor in interest, except that such transferee shall be entitled to receive and be credited or debited with its proportionate share of Profits, Losses, Gains from Capital Transactions, Company Cash Flow, Company Sales Proceeds, Company Refinancing Proceeds, and Distributions in liquidation.

(Operating Agreement § 8.4.) Georgia's LLC Act provides:

> To the extent that, pursuant to paragraph (1) of this Code section or otherwise at law or in equity, a member or manager has duties (including fiduciary duties) and liabilities relating thereto to a limited liability company or to another member or manager....

Ga. Code Ann. § 14-11-305(4) (2013). The Georgia LLC Act defines a Member as "a person who has been admitted to a limited liability company as a member as provided in Code Section 14-11-505 and who has not ceased to be a member as

provided in Code Section 14-11-601 or 14-11-601.1." Ga. Code Ann. § 14-11-101(16) (2013). Section 14-11-601 provides that "[a] person ceases to be a member of a limited liability company upon the occurrence of any of the following events: … (3) The member is removed as a member: (A) In accordance with the articles of organization or a written operating agreement …." Ga. Code Ann. § 14-11-601(b) (2013).

{39} For assignees or transferees of a membership interest, Georgia's LLC Act provides that "[a]n assignment of a limited liability company interest does not … entitle the assignee to … exercise any rights of a member until admitted as a member …," and that "[u]ntil the assignee of a limited liability company interest becomes a member, the assignor continues to be a member with respect to the assigned limited liability company interest …." Ga. Code Ann. § 14-11-502(3), (4) (2013).

{40} The plain language of the statute anticipates that members and managers may owe fiduciary duties to one another or to the LLC, but does not anticipate fiduciary duties being owed to an assignee. Moreover, the LLC Act specifically provides that an assignee is not entitled to assert any rights of a member. Thus, if Nelson has lost his status as a Member of Alliance due to insolvency, Defendants no longer owed fiduciary duties to him after the date upon which he became insolvent as that term is used in the Operating Agreement.

{41} Nelson's claim for breach of fiduciary duty then depends upon his ability to show: (1) that Defendants' actions occurred while Nelson remained a member of Alliance; and (2) that their actions constituted "willful misconduct involving self-dealing." (Order on Defs.' Mot. to Revise 2–3, Jan. 25, 2013.) While recognizing Nelson's high burden on this claim, the court has already determined that this analysis requires the resolution of disputed issues of fact, and as such, cannot be determined on summary judgment. (*See* Order on Defs.' Mot. to Revise, Jan. 25, 2013.)

{42} The court therefore DENIES Plaintiff's Motion to the extent it seeks the court's declaration that Axis and Tweeten have breached fiduciary duties.

{43}    Having resolved the separate issues, Plaintiff's Motion is DENIED in its entirety.

B.    Defendant's Motion for Summary Judgment

1.    Controlling Law

{44}    The court must first decide whether North Carolina or Georgia law determines Nelson's damage claims. It does so using North Carolina's conflict of law principles.

> [North Carolina's] traditional conflict of laws rule is that matters affecting the substantial rights of the parties are determined by lex loci, the law of the situs of the claim, and remedial or procedural rights are determined by lex fori, the law of the forum.

*Stetser v. TAP Pharm. Prods., Inc.*, 165 N.C. App. 1, 14, 598 S.E.2d 570, 580 (2004) (quoting *Boudreau v. Baughman*, 322 N.C. 331, 335, 368 S.E.2d 849, 853–54 (1988)).

{45}    Nelson's breach of fiduciary duty and constructive fraud claims sound in tort. *See Dallaire v. Bank of Am., N.A.*, 738 S.E.2d 731, 735 (N.C. App. Dec. 18, 2012) (breach of fiduciary duty is a tort claim); *Piedmont Inst. of Pain Mgmt. v. Staton Found.*, 157 N.C. App. 577, 589–90, 581 S.E.2d 68, 76 (2003) (breach of fiduciary duty and constructive fraud are tort claims). Traditionally, "[f]or actions sounding in tort, the state where the injury occurred is considered the situs of the claim." *Boudreau v. Baughman*, 322 N.C. 331, 335, 368 S.E.2d 849, 854 (1988). This traditional rule would suggest that North Carolina law would govern Nelson's breach of fiduciary duty and constructive fraud claims because the acts leading to Nelson's alleged injuries occurred in North Carolina. *See Synovus Bank v. Parks*, 2013 NCBC LEXIS 36, at *28 (N.C. Super. Ct. July 30, 2013).

{46}    North Carolina law, however, further provides that "[t]he laws of the state or other jurisdiction under which a foreign limited liability company is formed shall govern … the liability of its managers and members …." N.C. Gen. Stat. § 57C-7-01 (2013) The existence and extent of the fiduciary duties owed to Nelson, as

well as the question of whether a breach of those duties occurred, are therefore properly determined under Georgia law. *See Scott v. Lackey*, 2012 NCBC LEXIS 60, at *31, 69 (N.C. Super. Ct. Dec. 3, 2012) (citing to N.C. Gen. Stat. § 57C-7-01, the court applied Delaware law to determine the existence and extent of the fiduciary duties owed by the defendant manager-members of a Delaware limited liability company, and then used Delaware law to cite the elements of a claim for breach of fiduciary duty).

{47}   As the substance of Nelson's breach of fiduciary duty and constructive fraud claims is governed by Georgia law, so too should be the damages arising out of those claims. *See Tenn. Carolina Transp., Inc. v. Strick Corp.*, 16 N.C. App. 498, 500, 192 S.E.2d 702, 704 (1972) ("And the law of the place where rights were acquired or liabilities incurred also governs the award of damages, they being substantive in nature." (citing *Wise v. Howell*, 205 N.C. 286, 171 S.E.82 (1933))), *rev'd on other grounds*, 283 N.C. 423, 196 S.E.2d 711 (1973).

### 2.    Standard for Recovery of Damages Under Georgia Law

{48}   Before examining the particular aspects of Nelson's damages claims, the court first defines Georgia's general damage principles to be applied.

{49}   "In an action for breach of fiduciary duty, establishing a claim 'requires proof of three elements: (1) the existence of a fiduciary duty; (2) breach of that duty; and (3) damage proximately caused by that breach.'" *Rollins v. Rollins*, 321 Ga. App. 140, 150–51, 741 S.E.2d 251, 259 (2013) (quoting *SunTrust Bank v. Merritt*, 272 Ga. App. 485, 612 S.E.2d 818 (2005)); *see also Nalley v. Langdale*, 319 Ga. App. 354, 370, 734 S.E.2d 908, 920 (2012) ("A claim for breach of fiduciary duty requires proof of injury proximately caused by the breach." (quoting *SunTrust Bank v. Merritt*, 272 Ga. App. 485, 612 S.E.2d 818 (2005))). Nominal damages may be awarded for a breach of fiduciary duty claim. *See Moses v. Pennebaker*, 312 Ga. App. 623, 631, 719 S.E.2d 521, 529 (2011). However, "nominal damages are only available upon a showing of injury." *Nalley*, 319 Ga. App. at 370, 734 S.E.2d at 920

(citing Ga. Code Ann. § 51-12-4 (2013)); s*ee also Whiteside v. Decker, Hallman, Barber & Briggs, P.C.*, 310 Ga. App. 16, 20, 712 S.E.2d 87, 91 (2011) ("In the absence of specific proof of the amount of damages flowing from a tortious act, general or nominal damages may be inferred, but the defendant's liability for the damages must be established, including proof that the tortious act was the proximate cause of some actual loss.")

{50}    "Constructive fraud consists of any act of omission or commission, contrary to legal or equitable duty, trust, or confidence justly reposed, which is contrary to good conscience and operates to the injury of another." Ga. Code Ann. § 23-2-51 (2013). "However, constructive fraud is an equitable doctrine which will not support a claim for damages …." *Blakey v. Victory Equip. Sales*, 259 Ga. App. 34, 39, 576 S.E.2d 288, 293 (2002) (citing *Aliabadi v. McCar Dev. Corp.*, 249 Ga. App. 309, 547 S.E.2d 607 (2001)).

{51}    "In determining what is proximate cause the true rule is, that the injury must be the natural and probable consequence of the negligence, such a consequence as under the surrounding circumstances of the case might and ought to have been foreseen by the wrongdoer as likely to flow from his act." *Combs v. Atlanta Auto Auction, Inc.*, 287 Ga. App. 9, 14, 650 S.E.2d 709, 715 (2007) (quoting *Beasley v. A Better Gas Co., Inc.*, 269 Ga. App. 426, 604 S.E.2d 202 (2004)). There can be no proximate cause when the injury would have occurred even absent the alleged misconduct. *See id.* at 14, 650 S.E.2d at 715.

{52}    "The question of proximate cause is usually reserved for the jury and can be decided on summary judgment only in plain and indisputable cases." *Greenway v. Northside Hosp., Inc.*, 317 Ga. App. 371, 381, 730 S.E.2d 742, 751 (2012) (quoting *Vann v. Finley*, 313 Ga. App. 153, 721 S.E.2d 156 (2011)).

{53}    The court now applies these general principles to Nelson's specific claims.

3.     Damages for the Loss of the Gazebo Hill and River Run Properties

{54}     Nelson contends that the properties were sold below their "market value." (Nelson's Resp. to Defs.' Mot. for Partial Summ. J. 16–17.) Specifically, Nelson alleges the Gazebo Hill Property was appraised at $634,000.00 but sold for only $225,000.00, and the River Run Property was appraised at $206,000.00 but sold for only $50,000.00. (Nelson's Resp. to Defs.' Mot. for Partial Summ. J. 7–8.) Nelson further contends that, were it not for the wrongful refusal of Defendants to distribute the Sale Proceeds, he would have been able to pay the judgment owed to ORL and avoid the sale of the properties, or would have been able to redeem the properties in the one year after the sale. (Nelson's Resp. to Defs.' Mot. for Partial Summ. J. 15–16.) Nelson alternatively claims that his wife was required to satisfy his personal obligation to ORL, and that pursuant to Wisconsin law he is required to reimburse his wife for the loss of the properties. (Nelson's Resp. to Defs.' Mot. for Partial Summ. J. 15.)

{55}     In addition to challenging the nexus between Nelson's receipt of sales proceeds and his failure to redeem the properties, Defendants contend that, due to the Post-Nuptial Agreement, Nelson owned no interest in the properties, and therefore could not have redeemed them, nor can he claim any damages for their loss. (Mem. of Law in Supp. of Defs.' Mot. for Summ. J. as to Damages 5–7.) Nelson contends in response that he must have owned some interest in the properties; otherwise, ORL would not have been able to foreclose on the properties in partial satisfaction of a judgment solely against Nelson. (Nelson's Resp. to Defs.' Mot. for Partial Summ. J. 13–14.)

{56}     Under Wisconsin law, which governed the foreclosure sale of the properties, marital property agreements cannot limit the interests of a creditor "unless the creditor had actual knowledge of that provision when the obligation to that creditor was incurred …." Wis. Stat. Ann. § 766.55(4m) (2013), *see* Restatement (Second) of Conflict of Laws § 229 cmt. d (1971) (The method of foreclosing on a mortgage on land, as well as the power of the mortgagor to redeem

mortgaged land are governed by the local law of the situs.)  Applying Wisconsin law, the Wisconsin court approving ORL's foreclosure held that ORL was permitted to foreclose on the properties in partial satisfaction of its debt against Nelson because "Orlando Residence did not have notice of the agreement at the time [Nelson's] obligation to Orlando Residence arose …. Indeed, the agreement did not *exist* at that time." *Orlando Residence Ltd. v. Nelson*, No. 2008AP2989, 2009 Wis. App. LEXIS 1015, at *10, (Wis. Ct. App. Dec. 30, 2009).  Without the notice required by § 766.55(4m) of the Wisconsin Statutes, the default rules of the Wisconsin Marital Property Act applied.  *Schultz v. Sykes*, 248 Wis. 2d 791, 801, 638 N.W.2d 76, 80 (Wis. Ct. App. 2001).  Thus, at the time of the foreclosure sale, the houses were classified under the Wisconsin Marital Property Act as marital property, and Nelson had an undivided one-half interest in them. *See* Wis. Stat. Ann. § 766.31(3) (2012).  This interest constitutes a "right and title" to redeem the properties from the foreclosure sale.  Wis. Stat. Ann. § 815.40(1), (3) (2012).

{57}    But, proof that Nelson may have had the legal ability to redeem the properties is not alone sufficient to support his damages claims.  Nelson has failed to show, as a matter of law, that Defendants' actions in refusing to distribute the Sale Proceeds proximately caused the loss of the properties.  This conclusion is one that is "plain and indisputable," and proper for summary adjudication. *See* *Greenway*, 317 Ga. App. at 381, 730 S.E.2d at 751.

{58}    Nelson alleges that "the causal link to the Defendants is clear.  If Rolf Tweeten had disbursed the sale proceeds as he was required to do under the Alliance Operating Agreement," Nelson could have redeemed the homes.  (Nelson's Resp. to Defs.' Mot. for Partial Summ. J. 15–16.)  Nelson fails to recognize that Defendants' failure to distribute the Sale Proceeds did not cause Nelson to lose the Gazebo Hill and River Run properties in foreclosure; rather, those losses were caused by Nelson's failure to pay his debts.  Defendants' acts here are not a proximate cause. *See Combs*, 287 Ga. App. at 14, 650 S.E.2d at 715 (2007).

{59}    This same rationale applies to Nelson's claims for the expenses incurred in his having to move from the Gazebo Hill property, and his claim for

attorneys' fees incurred in attempting to avoid the foreclosure of the properties, regardless of whether he directly incurred these expenses or, as he alternatively argues, he is required to reimburse his wife for her payment of these expenses.

{60}    Therefore, Defendants' Motion is GRANTED insofar as it seeks to dismiss Nelson's claims for damages for the loss of the Gazebo Hill and River Run properties, including the moving expenses and attorneys' fees related to those properties, and this claim for damages is DISMISSED.

### 4.    The South Carolina Judgment

{61}    Nelson alleges that, had Tweeten timely distributed the Sale Proceeds, Nelson could have paid in full the obligation owed to ORL, ORL then "would have never obtained the [South Carolina] judgment in the first instance." (Nelson's Resp. to Defs.' Mot. for Partial Summ. J. 18.) Nelson also contends that, due to Defendants' actions, ORL was able to purchase the $4 million South Carolina judgment for less than $20,000.00, as had Nelson's wife done on behalf of GP Credit Company, apparently without complaint from Nelson, and seeks to recover the difference between the judgment's "market value" and the $20,000.00 ORL paid for it. (Nelson's Resp. to Defs.' Mot. for Partial Summ. J. 17–18.)

{62}    Nelson does not dispute that there has existed a $4 million judgment since Nelson signed a confession of judgment in 1994, and he makes no contention that he incurred the obligation as a result of Defendants' actions. (Mem. of Law in Supp. of Defs.' Mot. for Summ. J. as to Damages 8–9.) Rather, the crux of Nelson's claims for damages is that, as a consequence of Defendants' actions, the Tennessee Judgment owed to ORL could not be paid, which resulted in the Circuit Court for Ozaukee County, Wisconsin permitting ORL to acquire the South Carolina judgment from GP Credit Co., LLC, a company owned by Mrs. Nelson, in partial satisfaction of the Tennessee Judgment or other debt owed to ORL. *See* (Mem. of Law in Supp. of Defs.' Mot. for Summ. J. as to Damages 8–9; Nelson's Resp. to Defs.' Mot. for Partial Summ. J. 17–18.) In other words, Nelson alleges that when GP

Credit owned the South Carolina judgment against Nelson, Mrs. Nelson was not going to require Nelson to pay the judgment, but now he is being forced to pay it.

{63} The fact remains that Nelson has legally been obligated to pay the $4 million South Carolina Judgment since 1994, whether or not his wife took action to enforce that liability. *See Orlando Residence, Ltd. v. Hilton Head Hotel Investors*, 2013 U.S. Dist. LEXIS 36087, at *37 (D. S.C. Mar. 15, 2013) (finding that Nelson signed the confession of judgment for $4 million in 1994 and holding that the judgment is still valid). Nelson fails to present facts adequate to demonstrate a proximate causal link between Defendants' acts and the damages he claims. This too is a claim for which the lack of proximate cause is "plain and indisputable," *see Greenway*, 317 Ga. App. at 381, 730 S.E.2d at 751, and summary adjudication is proper. Nelson's claim for damages arising out of ORL's purchase of the South Carolina Judgment is, therefore, DISMISSED.

5. Loss in Value of Nelson's Interest in Alliance

{64} In his brief in opposition to Defendants' Motion, Nelson argues that Tweeten modified the structure of the Interstate Transaction so as to reduce the amount of money which could be distributed to Nelson. (Nelson's Resp. to Defs.' Mot. for Partial Summ. J. 19.) At the hearing on June 18, however, Nelson admitted that this argument had not been raised in the pleadings prior to his response to Defendants' Motion, and that he is no longer pursuing that theory. Nelson's central claim is that the Interstate Transaction has left Alliance unable to operate profitably, and that the decision to continue operating Alliance is being made in bad faith to allow Tweeten to use Alliance as "his personal bank." (Am. Compl. ¶¶ 96–100.) Nelson contends that the value of his ownership interest in Alliance is diminishing due to Tweeten's actions, including making loans to Tweeten's affiliates, paying himself the same salary Tweeten received when Alliance was a much larger company, and paying Tweeten's wife a large salary for working only a few days per week. (Nelson's Mem. in Supp. of his Mot. for Partial Summ. J. 13.)

{65}     Under Georgia law, generally, "'[w]here a shareholder alleges devaluation of shares due to corporate mismanagement,' the action must be brought as a shareholder derivation action." *Bobick v. Cmty. & S. Bank*, 2013 Ga. App. LEXIS 425, at *31 (May 22, 2013) (quoting *Lubin v. Skow*, 382 Fed. App'x 866 (11th Cir. 2010)); *see also Stoker v. Bellemeade, LLC*, 272 Ga. App. 817, 615 S.E.2d 1 (2005) (applying this rule in a suit involving a limited liability company), *rev'd on other grounds by Bellemeade, LLC v. Stoker*, 260 Ga. 635, 631 S.E.2d 693 (2006). However, a direct action may be proper in a closely-held LLC context if "the reasons for the general rule requiring a derivative suit do not apply," which include:

> (1) to prevent multiple suits by shareholders; (2) to protect corporate creditors by ensuring that the recovery goes to the corporation; (3) to protect the interest of all the shareholders by ensuring that the recovery goes to the corporation, rather than allowing recovery by one or a few shareholders to the prejudice of others; and (4) to adequately compensate injured shareholders by increasing their share values.

*Stoker*, 272 Ga. App. at 822, 615 S.E.2d at 7 (citing *Thomas v. Dickson*, 250 Ga. 772, 301 S.E.2d 49 (1983)).

{66}     In *Stoker*, for example, "[w]ith respect to the two-member LLCs at issue, the Stoker member of the LLC asserted that the other LLC member breached fiduciary duties by (1) usurping LLC opportunities …; (2) converting LLC assets by improperly transferring funds held by the LLC; and (3) improperly excluding the Stoker member from LLC affairs." *Id.* at 822–23, 615 S.E.2d at 7–8. The Court of Appeals upheld the trial court's ruling that the Stoker members had standing to assert their claims directly against the other LLC member, relying on the four factors listed above. *Id.*

{67}     Here, it is unclear to the court who the present Members of Alliance are. *See, e.g.* (Dep. of Rolf. A. Tweeten 46:7–14.) Moreover, there is evidence that there are outstanding creditors of Alliance. *See* (Dep. of Rolf A Tweeten 106–07, Oct. 10, 2012; Moore Aff. Ex. 2, May 6, 2013.) In any event, the funds alleged to have been mismanaged are owned by Alliance, not Nelson. Applying the factors enumerated in *Stoker*, the court concludes that the action for breach of fiduciary

duty for mismanagement of Alliance's funds if proper at all should have been brought derivatively on behalf of Alliance. Consequently, Nelson can not recover directly for the alleged mismanagement, and may not recover damages based on his alleged lost value in Alliance.

{68} Defendants' Motion is GRANTED insofar as it seeks to dismiss any claim of damages for diminution of share value and the claim is DISMISSED.

### 6. Punitive Damages

{69} "Punitive damages may not be recovered where there is no entitlement to compensatory damages." *Barnes v. White Cnty. Bank*, 170 Ga. App. 681, 681, 318 S.E.2d 74, 756 (1984). As the court has determined that Nelson is not entitled to recover any of his claimed categories of damages, he is furthermore not entitled to any punitive damages, and Defendants' Motion is GRANTED in so far as it seeks to dismiss Nelson's claim for punitive damages, and the claim is DISMISSED.

## VI. CONCLUSION

{70} For the foregoing reasons, Plaintiffs Motion is DENIED; Defendants' Motion is GRANTED.


IT IS SO ORDERED, this the 20th day of August, 2013.